IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

QUALITY PROPERTIES ASSET
MANAGEMENT COMPANY,
          *Plaintiff and Counter Defendant*,

                    v.

TRUMP VIRGINIA
ACQUISITIONS, LLC, ET AL.,
          *Defendants and Counter Claimants*,

                    v.

BANK OF AMERICA, N.A., ET AL.,
          *Counter Defendants*.

CIVIL ACTION NO. 3:11-CV-00053

MEMORANDUM OPINION

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE

The facts here present this question: Can a party hold a right of first refusal after the owner of the land benefitted by that right subdivided the land and distributed the subdivided parcels to several owners?  Given the particular facts of this case, the right of first refusal, which was reserved to "the then current owner" of a single, unified parcel of benefitted land, has been extinguished.

I.

Plaintiff seeks a declaratory judgment regarding a right of first refusal recorded in a June 1990 quitclaim deed conveying property in Albemarle County to Ms. Patricia Kluge.  By that deed, JWK Properties, Inc. (also "JWK Properties," or "JWK") conveyed to Ms. Kluge a 9.904 acre parcel, then known as Tax Map 102, Parcel 35 ("tax map parcel 102-35," or "TMP 102-35").  The quitclaim deed retained a right of first refusal in the 9.904 acre parcel, vested in "the

then current owner" of a much larger parcel that surrounded the 9.904 acre tract. The quitclaim deed refers to the surrounding parcel as the "Burdened Land" because it was burdened by easements that benefit the embedded 9.904 acre tract, but the Burdened Land carried the benefit of the right of first refusal (also the "right," or the "ROFR").

The matter is now before me on consideration of the parties'[1] cross motions for judgment on the pleadings (docket nos. 54, 56, & 69).[2]  Plaintiff seeks a declaration that the right of first refusal no longer exists, and thus Defendants have no right to purchase the 9.904 acre parcel and manor house (the "Main House Tract") acquired by Plaintiff through the foreclosure sale of a 97.98 acre parcel that comprises the 9.904 acre Main House Tract plus an additional 88.076 acres, a portion of which was formerly acreage within the Burdened Land.[3]  Defendants, who presently own a substantial portion (but not all) of the Burdened Land, and who did not own any of it at the time of the foreclosure sale, claim to hold the right of first refusal on the Main House Tract.  They seek an order setting aside the foreclosure sale; an injunction against any further

---

[1] I will refer generally to the parties as "Plaintiff" and "Defendants."  Plaintiff (also a Counter-Defendant) is Quality Properties Asset Management Company (also "QP," or "Quality Properties"). Defendants (and Counter-Claimants) are Trump Virginia Acquisitions, LLC, & Trump Vineyard Estates, LLC (also the "Trump Entities," or "Trump").  Counter Defendants are Quality Properties; Bank of America, N.A.; and Beale, Davidson, Etherington & Morris, P.C., Substitute Trustee.  The parties frequently refer collectively to Counter Defendants Quality Properties and Bank of America, N.A. as "the Bank."

[2] Defendants previously moved to dismiss, asserting that the court lacked subject matter jurisdiction because the Plaintiff could not meet its burden to show that the value of the right of first refusal (also the "right," or the "ROFR") exceeds $75,000 because the value of the right is speculative.  I denied the motion because the amount in controversy is the value of the whole of the real estate to which the claim extends, and Plaintiff alleges that the property is worth $15.26 million and that the claim of the ROFR clouds the entirety of the property, rendering it unmarketable.  As recounted in the factual summary contained in this opinion, the pleadings indicate that there is no dispute that the right is expressed in a recorded deed, and Defendants asserted a legal claim to the right, in writing, both before and after the foreclosure sale of Ms. Kluge's property (and further pursue the legal claim in their counterclaim).

[3] *See infra* note 15, and text thereby annotated.

sale of the Main House Tract; an order conveying the Main House Tract to Trump Acquisitions for a price to be determined by the court; and an injunction enforcing the purported right of first refusal.

I find that "the then current owner of the Burdened Land" extinguished the right by subdividing the Burdened Land, *i.e.*, the land benefitted by the right, and distributing smaller parcels of it to diverse owners.  Defendants cannot claim that their present possession of the greater portion of the Burdened Land reconstitutes the right of first refusal, because Plaintiff also owns a portion of the Burdened Land bordering the Main House Tract, and thus Defendants cannot be "the" current owner of "the" Burdened Land.  Indeed, at the time of the foreclosure sale, Defendants were not "the then current owner of" *any* of "the Burdened Land." Accordingly, I will grant the motions filed by Plaintiff and Counter Defendants (docket nos. 54 & 56), and I will deny Defendants' motion (docket no. 69).

## II.

A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) may be made "after the pleadings are closed but early enough not to delay trial."  Fed. R. Civ. P. 12(c).  A motion for judgment on the pleadings is appropriate when there are no genuine issues of material fact, and "only questions of law remain."  *Virginia Imports v. Kirin Brewery of America*, 296 F. Supp. 2d 691, 695 (E.D. Va. 2003).

To ensure that each litigant receives a full and fair hearing, courts will not grant a Rule 12(c) motion "unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law."  *O'Ryan v. Dehler Mfg. Co., Inc.*, 99 F. Supp. 2d 714, 718 (E.D. Va. 2000).  "Judgment should be entered when the pleadings,

construing the facts in the light most favorable to the non-moving party, fail to state any cognizable claim for relief, and the matter can, therefore, be decided as a matter of law." *Id.* (citing *Zeran v. America Online, Inc.*, 129 F.3d 327, 329 (4th Cir. 1997)); *see also* 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1368 (3d ed. 2004) (in reviewing a Rule 12(c) motion, the "court is required to view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party"). Thus, the standard of review for a Rule 12(c) motion is the same as the standard for a motion to dismiss under Rule 12(b)(6). *See Burbach Broadcasting Co. of Del. v. Elkins Radio*, 278 F.3d 401, 406 (4th Cir. 2002).

When considering a motion to dismiss for failure to state a claim upon which relief can be granted, I apply the pleading standard refined by *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). *See also* Fed. R. Civ. P. 12(b)(6), Fed. R. Civ. P. 8. The non-moving party must have alleged facts that "state a claim to relief that is plausible on its face," *i.e.*, facts that "have nudged their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. A claim is plausible if the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," and if there is "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). The following long-held rule still stands: "in evaluating a Rule 12(b)(6) motion to dismiss, a court accepts all well-pled facts as true and construes these facts in the light most favorable to the [non-moving party] in weighing the legal sufficiency of the complaint." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009) (citations omitted).

While extrinsic evidence is generally not to be considered at the Rule 12(b)(6) stage, "a

-4-

court may consider official public records, documents central to plaintiff's claim, and documents sufficiently referred to in the complaint so long as the authenticity of these documents is not disputed." *Witthohn v. Fed. Ins. Co.*, 164 Fed. App'x. 395, 396–97 (4th Cir. 2006); *see also Blankenship v. Manchin*, 471 F.3d 523, 526 n. 1 (4th Cir. 2006) (citations omitted).   Factual admissions by parties are, as a general rule, binding as judicial admissions, *see New Amsterdam Casualty Company v. Waller*, 323 F.2d 20, 24-25 (4th Cir. 1963), and the parties' exhibits, which are not in dispute, do not present matters outside the pleadings.   Accordingly, I need not exercise my discretion to convert the Rule 12(c) motion into a Rule 56 motion.   *See Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007) (citing with approval *Federal Practice and Procedure* § 1366 (recognizing the district court's discretionary power)).

## III.

The following facts are established by the pleadings, which include the parties' admissions and undisputed exhibits that do not present matters outside the pleadings and to which the parties have lodged no objections.

In 1984, John W. Kluge and Patricia M. Kluge, as husband and wife, conveyed multiple tracts of land they owned in Albemarle County to JWK Properties, Inc.[4]   This conveyance included the land that would eventually become known as the Main House Tract and the surrounding parcel of land, the so-called "Burdened Land."   By 1990, a large mansion, styled as "Albemarle House," had been built on the Main House Tract, and around 1990, John and Patricia

---

[4] The deed memorializing this conveyance states that it was made on the "10th day of December, 1984," but the notarization states that John W. Kluge acknowledged the instrument on December 17, 1985, and that Patricia M. Kluge acknowledged the instrument on December 14, 1985.

Kluge divorced.

On June 13, 1990, JWK executed a quitclaim deed conveying the Main House Tract to Patricia Kluge, "feme sole."[5]   The quitclaim deed described the Main House Tract as a parcel "containing 9.904 acres, more or less," "a portion of the property conveyed to JWK Properties by Deed of John W. Kluge, et al., dated December 10, 1984, of record in the Clerk's Office of the Circuit Court of Albemarle County in Deed Book 824, page 63, to which reference is hereby made (the 'Property')."  The quitclaim deed reserved a right of first refusal over the Main House Tract in favor of the Burdened Land, a large parcel of land generally surrounding the Main House Tract or, to put it another way, a large parcel of land within which the Main House Tract was more or less embedded.  As I have previously stated, the so-called Burdened Land was described as such because it was burdened by easements that benefit the Main House Tract, but it was in fact benefitted by the right of first refusal.  The deed defines the Burdened Land as "the lands of JWK Properties, currently shown as Parcel 35A on Albemarle County Tax Map 102."

Pertinent to the right of first refusal at issue in this case, the quitclaim deed of June 13, 1990, provides as follows:

> Kluge hereby COVENANTS and AGREES, that for so long as she is the owner of the Property, she will not accept an offer for the purchase of all or any portion of the Property without first notifying the then current owner of the Burdened Land of such offer.  In such event, the then current owner of the Burdened Land shall have the right to purchase said property at the same price and upon the same terms and conditions as those offered by such bona fide third party ("Right of First Refusal").

---

[5] Plaintiff states that this disposition of property was part of the divorce settlement between John and Patricia Kluge.  Defendants answer that they "lack knowledge or information sufficient to form a belief about the truth of" this statement.  Plaintiff counters that it has a "good faith basis for asserting this fact," as it "arose from the contemporaneous articles published in 1990 that report why John Kluge conveyed the Main House Tract to Patricia Kluge."  (Citation omitted.)  In any event, it is not disputed that he did convey the property to her and that they divorced around the same time, and the specific reason for the conveyance is immaterial.

The then current owner of the Burdened Land shall have fifteen (15) business days in which to exercise this Right of First Refusal after delivery to it of written notice by Kluge of the third party's bona fide offer. Notice shall be presumed to be delivered three days after notice is mailed by certified mail, postage prepaid, to the mailing address for the then current owner of the Burdened Land as shown in the records of the Real Estate Tax Assessor for Albemarle County, Virginia. This Right of First Refusal shall not apply to (i) any conveyance of the Property as security for any indebtedness of Kluge or (ii) deeds of correction, deeds to correct boundary line disputes and similar corrective instruments. This Right of First Refusal shall terminate for all time after compliance by Kluge with the provisions hereof and the failure by the then current owner of the Burdened Land to exercise this Right of First Refusal unless the conveyance contemplated by the <u>bona fide</u> third party offer does not occur, in which event this Right of First Refusal shall remain in full force and effect. Upon termination of the Right of First Refusal, as aforesaid, the then current owner of the Burdened Land shall execute a release of said Right of First Refusal which release shall be in recordable form.

This conveyance is made expressly subject to the easements, conditions, restriction, reservations and other matters, whether or not contained in duly recorded deeds, plats and other instruments constituting constructive notice in the chain of title to the Property hereby conveyed, it being plainly understood that this conveyance is without any warranty whatever.

This conveyance was authorized by unanimous consent of the board of directors of JWK Properties.

By deed of distribution dated August 31, 2000, JWK conveyed a substantial part of the Burdened Land, and also other land, to John W. Kluge. Recorded with the deed of distribution were subdivision plats, approved by Albemarle County, subdividing the land into multiple parcels. One of the plats indicated that, before the subdivision, the Burdened Land, *i.e.*, TMP 102-35A, consisted of 306.44 acres.[6]

---

[6] All of the deeds dated August 31, 2000, were executed on September 22, 2000, and they refer to plats dated September 19, 2000. The plat referred to in the deed of distribution of August 31, 2000, by JWK, grantor, and John W. Kluge, grantee, refers to "Plat Showing Division of Mountain Tract Being a Portion of Tax Map 102 Parcel 35A and Tax Map 103 Parcels 1E & 1B, Morven Farms, Albemarle County, Virginia." That plat includes, *inter alia*, the following notation describing the composition of TMP 102-35A prior to the subdivision:

TAX MAP 102-35A

(continued...)

By deed of gift dated August 31, 2000, John W. Kluge and his subsequent wife, Maria T. Kluge, conveyed to Patricia M. Kluge, trustee of the John W. Kluge, Jr. Trust, a parcel "containing 216.69 acres, more or less," indicated on the subdivision plat as the Golf Course Tract.  Most, but not all, of the Golf Course Tract consists of land within the Burdened Land.

By deed dated August 31, 2000, John W. Kluge conveyed subdivision plat parcels U, W, X, and Y, "containing 165.13 acres, more or less," to House and Garden Company, LLC. Parcels U (4.6 acres) and Y (78.82 acres) consist of land within the Burdened Land.

By deed of gift dated January 8, 2001, JWK conveyed the remaining land that it owned to the University of Virginia Real Estate Foundation, now part of the University of Virginia Foundation.[7]  This conveyance included a Parcel Z, which appears to have been land within the Burdened Land.[8]

_____

[6](...continued)

ORIGINAL ACREAGE – 306.44 ACRES
PARCEL N = 205.09 ACRES
PARCEL U = 4.60 ACRES
PARCEL Y = 78.82 ACRES
PARCEL Z = 17.93 ACRES
TOTAL - 306.44 ACRES

[7] Plaintiff states that the University of Virginia Real Estate Foundation later "merged into" the University of Virginia Foundation.  Defendants state that they "lack knowledge or information sufficient to form a belief about the truth of" this statement.  However, a deed made on April 30, 2004, and submitted as an exhibit to the complaint, states that it is "by and between **UNIVERSITY OF VIRGINIA FOUNDATION**, a Virginia non-stock corporation, *successor and merger to University of Virginia Real Estate Foundation*, Grantor, and **WILLIAM J. MOSES and PATRICIA M. KLUGE**, husband and wife, Grantees . . . ."  (Italicized emphasis added.)  Defendants' answer and counterclaim and amended answer and counterclaim admit that the deed "appear[s] to be [a] true and correct cop[y] of [a] document[] recorded in the Clerk's Office of Albemarle County."

[8] The deed includes the conveyance of a small Parcel Z, "containing 3.01 acres, more or less."  As discussed shortly herein, Patricia M. Kluge and her subsequent husband, William Moses, acquired, by deed dated April 30, 2004, several properties from the University of Virginia Foundation.  The properties included a parcel of land identified as "New Tax Map 103-1B" ("TMP 103-1B"), a 97.67 acre parcel that was "the combination of Residue, Parcel M and Parcel Z" as identified on the subdivision plat.  This Parcel Z includes
(continued...)

As a consequence of these conveyances, the Burdened Land was no longer owned by a single person or entity.  Rather, according to the subdivision plat of August 31, 2000, different parts of the Burdened Land were owned as follows:

- Parcel N was owned by Patricia M. Kluge, as trustee of the John W. Kluge, Jr. Trust;

- Parcels U and Y were owned by House and Garden Company, LLC;

- and Parcel Z was owned by the University of Virginia Foundation.

By deed dated April 30, 2004, Patricia M. Kluge and her subsequent husband, William Moses, acquired several properties from the University of Virginia Foundation.  The properties included a parcel of land identified as "New Tax Map 103-1B" ("TMP 103-1B"), a 97.67 acre parcel that was "the combination of Residue, Parcel M and Parcel Z" as identified on the subdivision plat.  Parcel Z includes land within the Burdened Land.

By deed of gift dated December 21, 2004, William Moses and Patricia M. Kluge, husband and wife, conveyed certain land, including TMP 103-1B, to Patricia M. Kluge.  Thereafter, by deed of bargain and sale dated December 21, 2004, Patricia M. Kluge conveyed to Kluge Estate Winery and Vineyard, LLC the land she had acquired by the December 21, 2004, deed of gift.

By a subdivision plat recorded on July 8, 2005, in conjunction with a Private Road Maintenance Agreement, Patricia M. Kluge and Kluge Estate Winery and Vineyard, LLC, by Patricia M. Kluge's husband, William Moses, re-subdivided their respective properties.  This subdivision created a new TMP 102-35, 97.98 acres that included the Main House Tract, Parcel U, and part of Parcel Y.

--------

[8](...continued)
land within the Burdened Land.

By deed of distribution dated July 8, 2005, Kluge Estate Winery and Vineyard, LLC,[9] by William Moses, granted to Patricia M. Kluge the parts of TMP 102-35 she did not already own.

As a consequence of the 2005 subdivision and deed of distribution, the Burdened Land was owned as follows:

• the land formerly identified on the subdivision plat of August 31, 2000, as Parcel N had become part of TMP102-35C, and was owned by Patricia M. Kluge, as trustee of the John W, Kluge, Jr. Trust;

• the land formerly identified on the subdivision plat of August 31, 2000, as Parcel U had become part of the new TMP 102-35, and was owned by Patricia M. Kluge;

• a section of the land formerly identified on the subdivision plat of August 31, 2000, as Parcel Y had become part of TMP102-35A, and was owned by Kluge Estate Winery and Vineyard, LLC, and a section of Parcel Y had become part of the new TMP 102-35, and was owned by Patricia M. Kluge;

• and the land formerly identified on the subdivision plat of August 31, 2000, as Parcel Z had become part of TMP 103-1B, and was owned by Kluge Estate Winery and Vineyard, LLC.

On November 6, 2007, Patricia M. Kluge borrowed $13.8 million from Bank of America, N.A. ("BofA"), securing the indebtedness with a deed of trust encumbering the new TMP 102-35, the 97.98 acre parcel that now includes the 9.904 acre Main House Tract, described in

_____

[9] This deed states that "House and Garden Company, L.L.C. became Kluge Estate Winery and Vineyard, L.L.C. by Certificate of Merger recorded in [the Clerk's Office of the Circuit Court of Albemarle County, Virginia] in Deed Book 2696, page 734."

"EXHIBIT 'A'" to the deed of trust as a

> [p]arcel containing 9.904 acres, more or less (comprising the original Tax Map 102-35), Parcel G, containing 78.99 acres, more or less, Parcel F, containing 2.15 acres, more or less, and Parcel E, containing 6.94 acres, more or less, all parcels comprising the new Tax Map 102-35 which is depicted on plat entitled "Plat Showing Redivision of Tax Map 102 Parcel 35A Tax Map 103 Parcel 1B and Tax Map 103 Parcel 1E ALBEMARLE FARMS Scottsville Magisterial District Albemarle County, Virginia" prepared by Gloeckner Engineeering/Surveying Inc., dated July 16, 2005 and recorded with a Declaration of Private Road Maintenance Agreement in Deed Book 3020 at Page 315.

When Patricia Kluge executed this deed of trust, she owned TMP 102-35, controlled Kluge Estate Winery and Vineyard, LLC,[10] and was trustee of the John W. Kluge, Jr. Trust.

Eventually, Patricia Kluge defaulted on loans she had taken out on her property.  In January 2011, a substitute trustee under BofA's deed of trust published a notice that he would conduct a foreclosure sale of TMP 102-35 on February 16, 2011.[11]

Prior to the foreclosure sale, Defendants asserted that they held a right of first refusal. First, on January 27, 2011, Stuart Subotnick, acting as a trustee of the John W. Kluge, Jr. Trust, executed a "MEMORANDUM OF ASSIGNMENT OF RIGHT OF FIRST REFUSAL," purporting, as "Seller," to have assigned to "Purchaser," identified as "Virginia Acquisitions LLC,"

> all of Seller's right, title and interest in, to and under that certain right of first refusal (the "ROFR") created under that certain Quitclaim Deed by and between JWK Properties, Inc. and Patricia M. Kluge dated as of June 13th, 1990; Recorded in the Clerk's Office of the Circuit Court of the County of Albemarle County, Virginia in

---

[10] As a director of Kluge Estate Winery and Vineyard, LLC, Patricia Kluge used her authority to mortgage its real property.

[11] Meanwhile, according to a trustee's deed executed on February 7, 2011, Kluge Estate Winery and Vineyard, LLC lost TMP 102-35A, TMP 103-1B, and TMP 103-1E at a foreclosure sale held on December 8, 2010.  The foreclosure purchaser thereafter conveyed these properties to Trump Vineyard Estates on May 9, 2011, and on March 10, 2011, Stuart Subotnick, acting as "TRUSTEE of the JOHN W. KLUGE, JR. TRUST under agreement dated August 28, 2000," conveyed TMP 102-35C to Trump Acquisitions.

Deed Book 1105, Pages 0185-0191 (the "ROFR Agreement") and held by Seller, as current owner certain real property more particularly described on Schedule "A" attached hereto and made a part hereof, said property being the Burdened Property (as defined in the ROFR Agreement), to purchase an approximately 9.904 acre portion, as more particularly described in Schedule "B" attached hereto and made a part hereof (the "ROFR Property"), of that certain real property designated as Lot [10200-00-00-03500] on the Tax Map of Albemarle County, Virginia, and as more particularly described on Schedule "C" annexed hereto.  In connection therewith, Seller has appointed Purchaser as its true and lawful agent and attorney-in-fact for the limited purposes exercising rights under the ROFR Agreement.  The provisions of the Assignment are incorporated herein by this reference.

(Quoted verbatim.)  The memorandum is executed by "SELLER," "STUART SUBOTNICK, TRUSTEE, JOHN W. KLUGE, JR. TRUST, under agreement dated August 28, 2000," and "PURCHASER," "VIRGINIA ACQUISITIONS LLC."   Additionally, it bears the following signature: "PATRICIA M. KLUGE, as owner of the ROFR Property, hereby acknowledges the assignment of the ROFR to Purchaser."

The "Schedule 'A'" referred to in the memorandum describes the following:

Parcel 1:

All that certain tract or parcel of land, together with all improvements thereon, and appurtenances thereto pertaining, located in the Scottsville Magisterial District of the County of Albemarle, Virginia, containing 216.69[12] acres, more or less, more particularly shown and described on plat . . . titled "Plat Showing Survey of Golf Course Tract Being a Portion of T.M. 102 Parcel 35A & T.M. 103 Parcel 1B, Morvan Farms, Albemarle County, Virginia," dated September 19, 2000, a copy of which is recorded in Deed Book 1957, at page 700.

BEING the same real estate conveyed to Patricia M. Kluge, Trustee of the John W. Kluge, Jr. Trust under agreement dated August 28, 2000, by deed from John W. Kluge, dated August 31, 2000, recorded September 28, 2000, in the Clerk's Office, Circuit Court, Albemarle County, Virginia, in Deed Book 1957, page 704.

Parcel 2:

---

[12] The images of these documents that were provided to the court are sometimes indistinct, and the numbers cited here may not be precisely correct.  In any event, such minor discrepancies are immaterial, as the material facts are not in dispute and this case turns solely on a question of law.

> All that certain tract or parcel of land situated in the Scottsville Magisterial District . . . containing 10.82 acres, more or less, designated as Parcel 1-H on [TMP] 103, particularly described on plat . . . titled "Physical Survey parcels 1D & 1H, Tax Map 103, Located Just Off Ste. Rte. 827, Near Overton, Scottsville Magisterial District, Albemarle County, Virginia," a copy of which is recorded in Deed Book 824, at page 72.
>
> BEING the same real estate conveyed to Patricia M. Kluge, Trustee of the John W. Kluge, Jr. Trust under agreement dated August 28, 2000, by deed from JWK Properties, Inc., dated March 14, 2001, recorded April 18, 2001, in the Clerk's Office, Circuit Court, Albemarle County, Virginia, in Deed Book 2012, page 86.

(Footnote added.)

The "Schedule 'B'" referred to in the memorandum purports to provide the following

"Description of the ROFR Property":

> That certain tract or parcel of land, with the improvement thereon and appurtenances thereto belonging, situated in the Scottsville Magisterial District . . . containing 9.904 acres, more or less, as shown on . . . a plat . . . dated April 18, 1990 . . . and attach [*sic*] to and made a part of that certain Quitclaim Deed dated June 13, 1990 by and between JWK Properties, Inc. and Patricia M. Kluge, feme sole and recorded in the Clerk's Office . . . in Deed Book 1105, page 185 . . . being a part of the property conveyed to JWK Properties, Inc. by Deed of John W. Kluge, et al, dated December 10, 1984 , pf [*sic*] record in the Clerk's Office . . . in Deed Book 824, page 63.

The "Schedule 'C'" referred to in the memorandum purports to provide the following

"Description of House Parcel":

> All of that certain lot or parcel of land (the "Property") located in Albemarle County . . . more particularly depicted as [a] Parcel containing 9.904 acres, more or less (comprising the original Tax Map 102-35), Parcel G, containing 78.99 acres, more or less, Parcel F, containing 2.15 acres, more or less, and Parcel E, containing 6.94 acres, more or less, all parcels being a portion of NEW T.M. 102-35 depicted on plat entitled "Plat Showing Redivision of Tax Map 102 parcel 35A Tax Map 103 Parcel 1B and Tax Map 103 Parcel 1B Albemarle Farms Scottsville Magisterial District Albemarle County, Virginia" . . . dated May 16, 2005, recorded with a Declaration of Private Road Maintenance Agreement as recorded in Deed Book 3117 at pages 157-175 (the "Plat").

This property is now described as follows:

-13-

All that certain tract or parcel of land, with improvements thereon and appurtenances thereto, situated in Albemarle County, Virginia, on the northwest side of State Road 627, containing 97.98 acres, more or less, shown as "New T.M. 102-35 of Albemarle Farms" on a plat . . . dated May 06, 2005, last revised November 10, 2005 and recorded in the Office of the Clerk . . . on December 05, 2005 in Deed Book 3117 at Page 171.

Street Address: 355 Albemarle House Drive, Charlottesville, Virginia 22902

On February 2, 2011, Jason D. Greenblatt, executive vice president and general counsel for "The Trump Organization," wrote to counsel for BofA regarding "Foreclosure Sale of Property in Albemarle County, Virginia known as 355 Albemarle House Drive, Charlottesville, VA 22902; Albemarle County Tax Map parcel 102-35 (the '*Property*')."  The letter stated, in pertinent part:

Please let this letter serve to represent the fact that we have a contract to buy the 200 acres in the front of the Property, as well as a Right of First Refusal (a "*ROFR*") to purchase the Property.  Please inform any and all potential bidders in connection with the foreclosure sale or otherwise that Mr. Trump has a ROFR with respect to the Property. . . .

The specific validity of rights of first refusal in the context of an involuntary foreclosure sale setting (just like a private sale) have been upheld by the Virginia Supreme Court.

Defendants made no demand for the substitute trustee to sell the Main House Tract as a separate parcel.  To be sure, Defendants knew that the Main House Tract was not being sold separately at the foreclosure sale, but Defendants did not object to the sale or seek to enjoin it. Instead, when the substitute trustee conducted the foreclosure sale on February 16, 2011, a representative from Trump Acquisitions appeared at the sale and bid $3.6 million for TMP 102-35.  BofA purchased TMP 102-35 at the foreclosure sale for a credit bid[13] of $15.26 million,[14]

---

[13] A "credit bid" allows the secured creditor to bid for its collateral using the debt it is owed to offset
(continued...)

which it assigned to Quality Properties.

On June 3, 2011, Eric Trump, the executive vice president for Trump Virginia Acquisitions LLC, wrote to Michael Kramer, an assistant vice president of BofA, stating, in relevant part:

> We understand that you have received a firm offer for Albemarle House (as defined below). I had placed a call to you about a week ago to discuss the purchase of this property, but had not heard anything back from you.
>
> Let me remind you that there are certain specified procedures in the right of first refusal (the "Right of First Refusal") created under the Quitclaim Deed, dated as of June 13, 1990 (the "Instrument"), by and between JWK Properties, Inc and Patricia M. Kluge . . . establishing for the benefit of the holder the absolute right to acquire certain real property (the "Albemarle House"). . . .
>
> As we have discussed in various correspondence over the last five months, Trump Virginia Acquisitions LLC, f/k/a Virginia Acquisitions LLC ("Trump," "we" or "us"), is the holder of the Right of First Refusal both as the owner of the 216.68 acre parcel of land fronting Albemarle House, and pursuant to the Assignment of Right of First Refusal dated January 27, 2011 by and between Stuart Subotnick . . . and Trump. . . .
>
> Under these documents, Trump has a Right of First Refusal, without limitation, to purchase the Albemarle House "at the same price and upon the same terms and conditions as those offered. . . ." Therefore, we want to ensure that you comply with these requirements and promptly deliver to Trump a true, correct and complete copy of (i) the offer letter or term sheet evidencing the referenced offer and (ii) the

---

[13](...continued)
the purchase price. Credit bidding ensures that, if the bidding at the sale is less than the amount of the claim the collateral secures, the secured creditor can, if it chooses, bid up the price to as high as the amount of its claim. That protects the secured creditor against being stripped of its collateral at below its real value. By using its credit to outbid a sale to a third party at a lower price, the secured creditor can choose to take possession of its collateral rather than be left under-compensated by the proceeds from a sale to another. "The ability to credit-bid helps to protect a creditor against the risk that its collateral will be sold at a depressed price. It enables the creditor to purchase the collateral for what it considers the fair market price (up to the amount of its security interest) without committing additional cash to protect the loan." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, ___ U.S. ___, ___, 132 S. Ct. 2065, 2070 n. 2 (2012).

[14] TMP 102-35 had been encumbered by the $13.8 million dollar first deed of trust and a second deed of trust for $4 million. The trustee's deed of February 16, 2011, indicates that Plaintiff's consideration for TMP 102-35 was $15,260,000.00, and the tax assessed value for the property was $16,329,600.00.

proposed contract of sale, together with all other documents necessary to determine, fully and in detail, the price and terms and conditions of the offer (collectively, the "Required Documents").

The Instrument clearly obligates you to deliver the Required Documents and provides Trump the right to determine, within <u>fifteen (15) business days</u> from the delivery date of these documents, whether to exercise the Right of First Refusal. Such fifteen (15) business days does not commence until you deliver all of the Required Documents to us.

Since under the terms of this filed documentation you are required to provide us notice of the proposed offer, you are also obligated to put the offeror on notice of the existence of the Right of First Refusal. You have our permission to provide (and, in fact, we strongly suggest that you provide) the offeror's representative with a copy of this letter.

It is also important to remember that you are prohibited under the Instrument from accepting any offer for the purchase of Albemarle House "without *first* notifying the then current owner of the Burdened Land of such offer."

In response, on August 4, 2011, counsel for Plaintiff wrote that the letters of February 2,

2011, and June 3, 2011,

asserted that Trump Acquisitions has a right of first refusal ("ROFR") to acquire [the 9.904 acre Main House Tract, known as] the Property. The asserted ROFR arises out of a Quitclaim Deed dated June 13, 1990 from JWK Properties, Inc. ("JWK") to Patricia M. Kluge ("Kluge"). That Quitclaim Deed conveyed a 9.904 acre tract to Kluge and defined that tract as the "Property." It also defined another tract of land, then shown as parcel 35A on the Albemarle County tax map, as the "Burdened Land." (The Burdened Land was burdened by various easements benefitting the Property.) The ROFR was exercisable by "the then current owner of the Burdened Land."

There currently is no single owner of the Burdened Land; it has multiple owners. A review of the chain of title to the Burdened Land indicates that the Burdened Land is now owned in part by three entities: Quality Properties, Trump Acquisitions and Trump Vineyard Estates, LLC. ("Trump Vineyard"). [*sic*, punct.]

At the time the Property was the site of a mansion, which served as the manor house and centerpiece of a 1000-acre estate owned by an entity controlled by John Kluge. The object of the ROFR was to give the owner of the Burdened Land an opportunity to bring the Property back into the larger estate if Kluge decided to sell the Property. That purpose has ceased to exist due to subsequent subdivisions of the Burdened Land.

-16-

As of the year 2000, the Burdened Land appears to have consisted of the following parcels, in whole or in part: N, U, Y and Z.

In 2000, JWK re-conveyed Parcel N to John Kluge. He then re-conveyed the land to Patricia Kluge, Trustee of the John W. Kluge, Jr. Trust. Parcel N is now part of Tax Map 102, Parcel 35C ("TMP 102-35C") and is owned by Trump Acquisitions.

Also in 2000, JWK re-conveyed Parcels U and Y to John Kluge. He then reconveyed this land to Home [*sic*] and Garden Company, LLC, which later merged into Kluge Estate Winery and Vineyard, LLC. As a result of the 2005 subdivision, Parcel U and a portion of Parcel Y became part of TMP 102-35, which Kluge Estate Winery and Vineyard, LLC deeded to Patricia Kluge, and which is now owned by Quality Properties. Another portion of Parcel Y is now part of Tax Map 102, Parcel 35A ("TMP 102-35A") and is owned by Trump Vineyard.

In 2001, JWK conveyed Parcel Z to the University of Virginia Real Estate Foundation, which merged into the University of Virginia Foundation. In 2004, the University of Virginia Foundation conveyed Parcel Z to William Moses and Patricia Kluge. Mr. Moses gifted his interest to Patricia Kluge and she later deeded the land to Kluge Estate Winery and Vineyard, LLC. This land is now known as Tax Map 103, parcel 1B ("TMP 103-1B") and is owned by Trump Vineyard.

As a result of the subdivisions, there is no longer a single, large estate for which the Property could serve as a manor house; for example, the Burdened Land is now part of four different tax parcels, one portion of the Burdened Land is a vineyard, another portion is a golf course, and another portion is owned by Quality Properties. If the ROFR still existed, there is no single owner of the Burdened Land who could enforce the ROFR. The ROFR would be unenforceable by someone who owned only a part of the Burdened Land.

Even if the foregoing events did not extinguish the ROFR, other events would have done this. The ROFR applied so long as Kluge was the owner of the Property, and also provided that the ROFR did not apply to "any conveyance of the Property as security for any indebtedness of Kluge." On November 6, 2007, Kluge mortgaged TMP 102-35 (which included the Property) to secure a loan from BOA. At that time, she owned or controlled the Property and all properties which formerly constituted the Burdened Land.

That mortgage was foreclosed on February 16, 2011, and BOA was the high bidder at the foreclosure sale. BOA assigned the right to acquire TMP 102-35 to the current owner, Quality Properties. Thus, the ROFR has terminated because Kluge no longer owns the Property. The ROFR did not apply to the foreclosure sale because of the prior subdivisions and also because Kluge's right to mortgage the Property implies the right to convey marketable titled to the mortgage lender.

-17-

Your assertion that the ROFR survived the foreclosure sale is untenable for an additional reason. If the ROFR did not terminate when Kluge ceased to own the Property, there would be no measuring life to limit the time during which the ROFR could be exercised. This would cause the ROFR to violate the rule against perpetuities. *Lake of the Woods Ass'n, Inc. v. McHugh*, 238 Va. 1, 380 S.E.2d 872 (1989).

If the ROFR existed at the date of foreclosure sale and applied to the sale, then the owner of the ROFR's legal remedy would be limited to an action in ejectment against Quality Properties. *Fairfax County v. Rieske*, 281 Va. 441, 707 S.E.2d 826 (2011). Under *Rieske*, the owner of the Burdened Land would have no right of first refusal as to a subsequent re-sale of the Property by Quality Properties.

As discussed above, there was no owner of the ROFR at the foreclosure sale date because the Burdened Land had been subdivided in 2000, and the subdivided parcels were then assigned to multiple owners. Thus, to be clear, neither Trump Acquisitions nor anyone else has any right of first refusal over the Property. However, while reserving all rights in this matter, Quality Properties will offer Trump Acquisitions, or as it may assign to another entity affiliated with Donald J. Trump, an opportunity to acquire TMP 102-35 on the terms set forth in the right of first refusal. The terms are as follows: (1) the purchase price is $15.26 million (the foreclosure sale price); (2) Trump Acquisitions must provide written notice of its intent to accept this offer within 15 business days of receipt of this letter; and (3) Trump Acquisitions must agree to close on the Property within a reasonable time.

This offer is subject to the additional condition that all of the owners of the Burdened Land must consent to Trump Acquisitions' exercise of the ROFR and release any claims they may have against Quality Properties arising out of the ROFR. Quality Properties would provide its consent and release. Trump Acquisitions would be required to obtain such consents and releases from the other owner of part of the Burdened Land, Trump Vineyard. As this entity is Trump-related, this condition should not present an obstacle to Trump Acquisitions purchase of the Property.

If Trump Acquisitions does not accept these terms, Quality Properties demands that Trump Acquisitions deliver a release of the ROFR, in recordable form, within 15 days. If that is not done, Quality Properties intends to take legal action to establish that the ROFR no longer affects the title to the Property. A draft complaint, with exhibits, in enclosed for your review. Quality Properties may re-draft the Complaint, if it learns that there are additional fact relevant to this case.

Defendants did not sign the release or accept Plaintiff's offer to purchase TMP 102-35 on the foreclosure sale terms. Plaintiff filed the instant complaint on August 26, 2011.

-18-

**IV.**

The preceding factual summary documents that, at *present*, Plaintiff (Quality Properties) and Defendants (Trump Vineyard and Trump Acquisitions) each own a portion of the Burdened Land, which, by definition, did not include the 9.904 acre Main House Tract.    Indeed, Defendants' own allegations acknowledge the diverse ownership of parcels of land that formerly constituted the Burdened Land:  Defendants allege that they own 94% of the Burdened Land and Plaintiff owns 6%.  Regardless of the accuracy of these claimed percentages, Plaintiff owns a single 97.98 acre parcel that comprises the 9.904 acre Main House Tract and an additional 88.076 acres of land, which includes some portion of Burdened Land, and the boundaries of the Albemarle House property includes this portion of the Burdened Land.[15]    Thus, Defendants acknowledge that they are not "the" owners of "the" Burdened Land, because they own only a

---

[15] Plaintiff states that it "lacks knowledge or information sufficient to form a belief as to the truth of" Defendants' allegation that they own 94% of the Burdened Land and Plaintiff owns 6%.  Nonetheless, for the purpose of the following calculations, I will assume *arguendo* the accuracy of Defendants' percentages. Defendants "admit that as of the date of suit, they are the owners of roughly 94% of the property referred to in Exhibit 2 as the 'Burdened Land[.]'"  That exhibit is the quitclaim deed of June 13, 1990, and it defines the Burdened Land as "the lands of JWK Properties, currently shown as Parcel 35A on Albemarle County Tax Map 102."  As stated earlier in this opinion, Tax Map 102-35A indicates that the Burdened Land, when it was so entitled in the quitclaim deed of June 13, 1990, consisted of 306.44 acres.  *See supra* note 6, and text annotated thereby.  Thus, it appears that Defendants' 94% must account for 288.0536 acres of Burdened Land, and Plaintiff's 6% must account for 18.3864 acres of Burdened Land.  Regardless of the accuracy of these percentages and acreages, Defendants admit that they do not own all of the Burdened Land, and that the portion of the Burdened Land owned by Plaintiff borders, at least in part, the Main House Tract.

I stress that Defendants admit that the deeds, plats, and other chain of title exhibits Plaintiff submitted with its complaint "appear to be true and correct copies of documents recorded in the Clerk's Office of Albemarle County."  Nonetheless, Defendants "deny that said Exhibits constitute *all* of the documents in the chain of title relevant to this dispute."  (Emphasis added.)  Perhaps the exhibits do not constitute *all* of the documents in the chain of title for the Burdened Land and the Main House Tract, and perhaps my tracing of the rather complicated chains of title of the various plats and parcels is in some way deficient or erroneous; however, the documents submitted with the complaint are certainly sufficient to resolve the motions before me, as Defendants cannot deny that the pleadings establish the following facts:  John Kluge subdivided the parcel of land formerly known as "the Burdened Land"; John Kluge conveyed parcels of the subdivided land to diverse parties; Patricia Kluge subsequently re-subdivided it; Defendants do not own all of "the Burdened Land"; and Defendants do not own all of the Burdened Land bordering "the Main House Tract."

-19-

portion of it, and Plaintiff is also an owner of a portion of "the" Burdened Land.  To be sure, Defendants "now own the lion's share of the Burdened Land" (as they describe it), including the 215-plus acre Golf Course Tract, which they describe as the intended "front yard" of the Main House Tract; however, Defendants own only a portion of the Burdened Land, and the portion owned by Plaintiff also embraces the Main House Tract.  Significantly, at the time of the foreclosure sale, Defendants did not own *any* of the Burdened Land; rather, they possessed only options on the portions of the Burdened Land they eventually came to own.[16]

As neither party genuinely disputes these operative facts, which have been established through the pleadings, I can decide the issue as a matter of law.  As this case is before me in diversity jurisdiction, my "'role is to apply the governing state law, or, if necessary, predict how the state's highest court would rule on an unsettled issue.'"  *BP Products North America, Inc. v. Stanley*, 669 F.3d 184, 188 (4th Cir. 2012) (quoting *Horace Mann Ins. Co. v. General Star Nat. Ins. Co.*, 514 F.3d 327, 329 (4th Cir. 2008)).  Although there is no Virginia case directly on point, settled law directs my opinion.

Rights of first refusal, "'more commonly known as "preemptive rights," are interests in property and not merely contract rights.'"  *Lake of the Woods Ass'n v. McHugh*, 238 Va. 1, 6 (1989) (reasoning that a right of first refusal is subject to the rule against perpetuities) (quoting *Ferrero Constr. v. Dennis Rourke Corp.*, 311 Md. 560, 565 (1988)).  A right of first refusal constitutes "a real covenant relating to land," *Winn v. Stevenson*, 26 Va. Cir. 271, 1992 WL 12034051 at *1 (1992), as long as it documents "'an agreement between two or more parties, by deed and in writing, signed and delivered, by which either of the parties pledges to the other that

---

[16] *See supra* note 11, and *infra* note 20, and text annotated thereby.

something is either done, or will be done, or will not be done, or stipulates to the truth of certain facts,'" *id*. at n. 1 (quoting 5A Michie's Jurisprudence, "Covenants," § 2 (1991)).

"A right of first refusal limits a property owner's right 'to dispose freely of his property by compelling him to offer it first to the party who has the first right to buy.'" *Firebaugh v. Whitehead*, 263 Va. 398, 404 (2002) (quoting *Landa v. Century 21 Simmons & Co.*, 237 Va. 374, 381 (1989)). Rights of first refusal are fully enforceable under Virginia law. *See*, *e.g.*, *Landa*, 237 Va. at 383-84; *Cities Service Oil Company v. Estes*, 208 Va. 44, 49-50 (1967). Indeed, those rights are created for the "benefit" of the holder, and "must, therefore, be interpreted with that purpose in mind." *Id.*, 237 Va. at 380 (citing *Cities Service Oil Company*, 208 Va. at 49). Still, "under Virginia law, covenants 'restricting the free use of land are not favored and must be strictly construed.'" *BP Products North America, Inc.*, 669 F.3d at 188 (quoting *Mid–State Equipment Co., Inc. v. Bell*, 217 Va. 133, 225 (1976)).

When documents such as covenants and deeds are "unambiguous," Virginia courts "accord those documents their plain meaning." *Beeren & Barry Investments, LLC v. AHC*, 277 Va. 32, 37 (2009) (citations omitted). "A change in circumstances that is 'so radical as practically to destroy the essential objects and purposes of the [covenant]' will render a . . . covenant null and void." *Double Diamond Properties, LLC v. BP Products North America, Inc.*, 277 Fed App'x. 312, 318 (4th Cir. 2008) (case regarding restrictive covenant; bracketed insertion in original) (quoting *Chesterfield Meadows Shop. Center v. Smith*, 264 Va. 350, 356 (2002) (covenant destroyed)). "The determination of the degree of change necessary to have this effect is inherently a fact-specific analysis in each case." *Chesterfield Meadows Shop. Center*, 264 Va. at 356.

Here, the right of first refusal was extinguished when John Kluge subdivided and

-21-

distributed the Burdened Land to diverse owners, because that subdivision constituted a change in circumstances "so radical as practically to destroy [its] essential objects and purposes," *id.*, 264 Va. at 356, and thus the right of first refusal is "null and void," *Double Diamond Properties, LLC*, 277 Fed App'x. at 318.  The unambiguous language of the covenant provides that "*the then current owner of the Burdened Land* shall have the right to purchase [the Main House Tract] at the same price and upon the same terms and conditions as those offered" to Patricia Kluge by a "bona fide third party," and that Patricia Kluge would "not accept an offer for the purchase of all or any portion of the Property without first notifying *the then current owner of the Burdened Land* of such offer." (Emphasis added.)  For the purposes of the instant motions, the object and purpose of the right of first refusal are plain enough:  it reserves a right of first refusal to "the then current owner of *the* Burdened Land," *i.e.*, to *the* owner of a *single* parcel of land.  The object and purpose of this covenant cannot be met, however, because the Burdened Land no longer exists as a single parcel; in fact, Plaintiff owns a portion of the Burdened Land, and after John Kluge subdivided the Burdened Land, the owner of the Main House Tract came to own and control the Burdened Land.

It is clear that the right of first refusal was created for the "benefit of the person who is given the right," *Landa*, 237 Va. at 383-84 (citing *Cities Service Oil Company*, 208 Va. at 49), *i.e.*, for the benefit of "the then current owner of *the* Burdened Land." (Emphasis added.)  But when John W. Kluge subdivided the Burdened Land and conveyed portions of it to several owners, the essential objects and purposes of the covenant could no longer be served because they were impossible – the "Burdened Land" no longer existed as a single parcel, and thus no owner of the single parcel of "Burdened Land" could claim entitlement to the right.  Accordingly, when Patricia Kluge thereafter acquired control over separate parcels of the

-22-

Burdened Land, she was able to re-subdivide and re-plat it, taking the trouble to combine the Main House Tract with an additional 88 acres, including Burdened Land, to create a new TMP 102-35.   The subdivision and severance of ownership of the Burdened Land destroyed the essential object and purpose of the right of first refusal, rendering it unenforceable, because it is not possible to have a right reserved to the owner of a single parcel known as "the Burdened Land" when "the Burdened Land" no longer exists as a single parcel, and diverse parties own separate parcels of "the Burdened Land" that border the Main House Tract.

The facts and circumstances of this case indicate the impossibility of enforcing the right since the subdivision.  For example, had Patricia Kluge wished to sell Albemarle House to a bona fide purchaser in 2000, after John Kluge subdivided and conveyed parts of it to different parties, to whom was she covenanted to provide notice and an opportunity to purchase?  Herself, as trustee of the John W. Kluge, Jr. Trust?  House and Garden Company, LLC (in essence, herself)?[17]  The University of Virginia Foundation?  If she had wished to sell Albemarle House in late 2005, to whom would she have turned with the right of first refusal?  Herself?  Herself, as trustee of the John W, Kluge, Jr. Trust?  Kluge Estate Winery and Vineyard, LLC (again, essentially herself)?[18]  By 2004, Patricia Kluge owned or controlled all of the Burdened Land, either in her own name, as director of Kluge Estate Winery and Vineyard (along with Mr. Moses, her subsequent husband), or as trustee of the John W. Kluge, Jr. Trust.  In 2005, when she re-subdivided the Burdened Land, she combined some of it with the Main House Tract to

---

[17] As indicated in the factual summary, Patricia Kluge was a director of Kluge Estate Winery and Vineyard, LLC, and by merger, House and Garden Company, LLC became Kluge Estate Winery and Vineyard, LLC.  *See supra* note 9, and *supra* note 10.

[18] *See supra* note 17.

form the new TMP 102-35, a 97.98 acre parcel that included the 9.904 acre Main House Tract. She was able to do this because there was no longer a single parcel of "Burdened Land," and there was no longer a right of first refusal.  Once the Burdened Land was subdivided, and its parts granted to several owners, the object of the right of first refusal ceased to exist, because the right ceased to have any practical purpose or intelligible operation.[19]

In essence, Defendants claim to have reconstituted the right of first refusal by purchasing "the lion's share" of the Burdened Land.  But even if Defendants now owned all of the Burdened Land, they owned none of it at the time of the foreclosure sale, and the right of first refusal is explicitly reserved to "the then current owner of the Burdened Land."  As Defendants point out, the Supreme Court of Virginia commands that "[d]eeds are to be construed by giving the words used their natural and ordinary meaning."  *Bailey v. Town of Saltville*, 279 Va. 627, 633 (2010) (citations omitted).  Defendants did not own *any* portion of the Burdened Land until March 10, 2011, *after* the foreclosure sale, when Trump Acquisitions exercised its option to purchase the portion then owned by the John W. Kluge, Jr. Trust, and the language of the deed here specifies

---

[19] The Supreme Court of Virginia has observed that, when determining whether a contract is assignable, "[r]egard should be given to the intention of the parties and such intention should be given effect." *McGuire v. Brown*, 114 Va. 235, 241 (1912).  In this case, however, free assignability of the right of first refusal to separate landowners would contradict that intention, given that the right is reserved to the owner of a single, unified parcel of Burdened Land, which no longer exists as a single, unified parcel.  Likewise, allowing Defendants to exercise a right of first refusal reserved to "the then current owner" at a time when they owned absolutely no portion of the Burdened Land would also repudiate that intention.

Furthermore, were a court to find that Defendants hold the right of first refusal on the 9.904 acre Main House Tract, that would leave certain parcels of land – as I have calculated it, about 18 acres (*see supra* note 15) – "orphaned," or "landlocked," and surely the essential object and purpose was not to leave slivers of the "Burdened Land" bordering Albemarle House separated and unsaleable.  For example, the Main House Tract separates the western tip of TMP 102-35, identified as Parcel E on the 2005 subdivision plat, from the main body of TMP 102-35 running south to State Route 627.  No portion of former Parcel E affronts any public or private right of way.  Even if one attempted to re-subdivide TMP 102-35 and separate the Main House Tract from the remainder of TMP 102-35, such a subdivision would effectively "landlock" or "orphan" Parcel E in violation of the Albemarle County Code.  *See* Albemarle Cnty. Code, § 14-404(A); *see also* Va. Code § 15.2-2254 (prohibiting unauthorized subdivision of land).

-24-

that the right is reserved to "the then current owner of the Burdened Land," not to an option-holder on some portion thereof.  Defendants contend that, as option-holders, they owned the right of first refusal because "a contractual right of first refusal is *freely transferrable*."  Indeed, "[i]t is settled law that as a general rule the obligation arising under a contract may be assigned to a third party."  *J. Maury Dove Co. v. New River Coal Co.*, 150 Va. 796, 826-27 (1928).  But, even assuming that the right of first refusal here is an assignable contract right, the plain language of the deed does not contemplate a right apportioned in percentages.  In order to reconstitute the right described in the deed, Defendants would have needed the assignment of the right held by the then current owner (or owners) of the land now owned by Plaintiff, and Defendants cannot claim to have held that assignment.[20, 21]

---

[20] I underscore that, at the time of the foreclosure sale, and as a result of the various subdivisions described in this opinion, the Burdened Land was owned by the substitute trustee (subject to the equitable rights of Patricia Kluge), Grand Cru Properties, LLC ("Grand Cru"), and the John W. Kluge, Jr. Trust.  Grand Cru is a subsidiary of and successor in interest to Farm Credit of the Virginias, ACA.  *See Kluge Estate Winery and Vineyard, LLC v. Farm Credit of the Virginias, ACA*, Civil Action No. 3:11-cv-00028 (W.D. Va.), docket no. 2 at note 2 (describing Grand Cru as "the entity that Farm Credit formed to hold the Property after foreclosure").  On May 9, 2011, Trump Vineyards purchased a portion of the Burdened Land from Grand Cru.  *See also supra* note 11, and text annotated thereby, and *supra* note 16, and annotated text.

[21] As I have remarked, my opinion here is distilled from settled Virginia law.  Still, the specific question of whether a right of first refusal benefitting a parcel of land survives the subdivision of that parcel into multiple tracts conveyed to multiple owners appears to be an issue of first impression in Virginia.  I note that there is a somewhat analogous case from New York, *Levy v. Blue Ridge Construction Co., Inc.*, 345 N.Y.S.2d 314 (Sup. Ct. 1973), *aff'd* 355 N.Y.S.2d 567 (App. Div. 1974) (summarily affirmed without opinion).

In *Levy*, the owner (Mr. Levy) of a 100 acre parcel of land deeded all but 4.7 acres of that parcel to the "Barons."  *Id*. at 315.  The deed granted to the Barons an "option of first refusal" to purchase the remaining 4.7 acres.  *Id*.  The Barons thereafter divided the parcel they had purchased, conveying parcels to "separate parties" who, in turn, conveyed their interests to two construction companies and two individuals.  *Id*. at 315-16.  Later, the owner of the 4.7 acres attempted to sell that parcel, and in response, three separate owners claimed to hold the right of first refusal.  *Id*. at 316-17.

Observing that, under New York law, the elements of a "real covenant" are that "it must touch or concern the land with which it runs," "it must appear that the grantor and grantee intended the covenant to run with the land," and that "it must appear that there is privity of estate between the party claiming the benefit and the party who rests under its burden," *id*. at 316, the court found that, were

(continued...)

## V.

For the stated reasons, I will grant the motions for judgment on the pleadings filed by Plaintiff and Counter Defendants (docket nos. 54 & 56), and I will deny Defendants' cross motion for judgment on the pleadings (docket no. 69).   Accordingly, Plaintiff's request for declaratory relief will be granted.

An appropriate order accompanies this memorandum opinion.

Entered this _____16th_____ day of August, 2012.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE

---

[21](...continued)

the court to adopt the construction urged upon it—that the Levy covenant runs with the land—the question arises: who shall have the right to enforce it?  Originally intended for the benefit of a single owner holding some 95 acres of land, the present status reflects three separate owners, each claiming the option of first refusal.  The statement of this problem provides the answer respecting the intention of the original parties to the conveyance.  It is consonant only with the construction suggested above; to wit, that this was a personal covenant running only to the grantee named in the deed.

*Id*. at 316-17.  Accordingly, plaintiff was "determined to be the owner of the Levy parcel free from all claims and restrictions," and was "therefore free to sell the property on an open market undisturbed by option claimants." *Id*. at 317.

While I need not find that the right of first refusal in this case was a "personal covenant," I do recognize that the deed here granted a covenant to the specific grantee named in the deed, *i.e.*, "the then current owner of the Burdened Land."  Applying settled principles of Virginia law, and as heretofore explained, I find that, when John Kluge subdivided the land, long before the foreclosure sale, there was no longer a single, unified parcel of Burdened Land that could benefit from the right covenanted to it, and thus it practically goes without saying that there was no longer any such grantee.  Accordingly, the covenant, *i.e.*, the right of first refusal, was "render[ed] . . . null and void." *Double Diamond Properties, LLC v. BP Products North America, Inc.*, 277 Fed App'x. 312, 318 (4th Cir. 2008); *see also Chesterfield Meadows Shop. Center v. Smith*, 264 Va. 350, 356 (2002).

-26-